IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEON ALLEN and | : | |
| LAWRENCE WILLIAMS, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DISTRICT ATTORNEY'S OFFICE | : | NO. 08-1080 |
| OF PHILADELPHIA, PETER DAILEY, | : | |
| ROBERTITO FONTAN, JOSEPH | : | |
| GEORGE, RICHARD T. GRAMLICH, | : | |
| LEWIS B. PALMER, KAREN | : | |
| HEYWARD, JOHN MCCONNELL, | : | |
| JOHN DOE, and RICHARD ROE | : | |
| | : | |
| Defendants. | : | |

BUCKWALTER, S. J.                                    August 3, 2009

**MEMORANDUM**

    Before the Court is a Motion for Summary Judgment (Docket No. 22) filed by Defendants the District Attorney's Office of Philadelphia, Peter Dailey, Robertito Fontan, Joseph George, Richard T. Gramlich, Lewis B. Palmer, Karen Heyward, John McConnell, John Doe, and Richard Roe ("Defendants"), and the Response of Plaintiffs Leon Allen and Lawrence Williams ("Plaintiffs") (Docket No. 24). For the reasons stated below, Defendants' Motion is granted in part and denied in part.

**I. PROCEDURAL BACKGROUND**

    On March 4, 2008, Plaintiffs filed a Complaint against the City of Philadelphia, Philadelphia Police Commissioner Sylvester Johnson, Police Officer John Doe, and Police

Officer Richard Roe alleging that Defendants engaged in a unlawful search and seizure that deprived Plaintiffs of their due process rights "in violation of the Fourth, Fifth, Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983." (Compl. ¶ 15.) Plaintiffs also assert that in the process of depriving them of their property, Defendants inflicted $2,500.00 worth of damage to their home's outside door. (Id. ¶ 13.) Plaintiffs also raised a second claim alleging "unlawful seizure and taking of property under the laws and Constitution of the Commonwealth of Pennsylvania." (Id. ¶ 18.) Plaintiffs filed an Amended Complaint on September 23, 2008, adding the District Attorney's Office of Philadelphia as a Defendant. (Am. Compl. ¶ 5.) Plaintiffs filed a Second Amended Complaint on March 11, 2009. This iteration of the Complaint added the following Defendants: Peter Dailey; Robertito Fontan; Joseph George; Richard T. Gramlich; Lewis B. Palmer; Karen Heyward; and John McConnell. (Sec. Am. Compl. ¶ 6.)

By stipulation the parties agreed to dismiss Defendants City of Philadelphia and Sylvester Johnson. (Docket No. 21.) The remaining Defendants filed a Motion for Summary Judgment, and Plaintiffs timely filed their response.

## II. FACTUAL BACKGROUND[1]

On March 28, 2007, detectives from the Philadelphia District Attorney's Office's Dangerous Drug Offenders Unit were tasked with sealing two homes forfeited due to ongoing, illegal drug activity at each residence. (Pls.' Resp. Mot. Summ. J. 2; Defs.' Mot. Summ. J. 2 (citing Ex. A., List of Home Sealings for week of Mar. 26, 2007).) The second home to be

---

1. For the purposes of considering a summary judgment motion, any discrepancies will be construed in favor of the non-movant.

sealed was located at 2637 West Silver Street (Id.) After seizing the first property, the officers commenced their efforts to seal 2637 West Silver Street. Between eight or nine o'clock in the morning, Officer Dailey arrived at the 2600 block of West Silver Street, saw a house, and noticed activity at the home including "people walking in and out of the house with bottles of beer." (Defs.' Mot. Summ. J.; Ex. B, Deposition of Peter C. Dailey ("Dailey Dep.") 12:1-3, Mar. 11, 2009.) At this time, Officer Dailey exited his car, approached the property, and knocked on the door of the house where he had seen people with beer bottles. (Id. at 12:15-22.) It is at this point that the deposition testimony of Defendant Dailey and Plaintiff Allen differ somewhat, yet the basic contours of their statements are the same – detectives arrived at the home seeking permission to enter, they were granted admission to the residence, and ordered everyone out of the house because it had been forfeited. See (Id., Dailey Dep. 17:11-18:20.; Pls.' Resp. Mot. Summ. J.; Ex. 1, Deposition of Leon Allen ("Allen Dep.") 22:14-23:25, Mar. 5, 2009.)

Allen claims that a neighbor, seeing the commotion, asked to see the list of homes to be sealed, and upon reading the list, informed the detectives that: (a) they were sealing the wrong home, 2636 West Silver Street; and (b) the home to be seized, 2637 West Silver Street, which was clearly numbered, was directly across the street. (Pls.' Resp. Mot. Summ. J., Allen Dep. 24:21-25:9.)

The detectives assert that this mistake[2] – the eviction, discovery of their error, and the occupants re-entry into 2636 W. Silver Street only took a few minutes. See (Defs.' Mot. Summ. J.; Dailey Dep. 24:22-25:3; Defs.' Mot. Summ. J.; Ex. E, Deposition of John McConnell ("McConnell Dep."), 25:14-26:13, Mar. 11, 2009.) Conversely, Plaintiffs assert that they were evicted for a "couple of hours." (Pls.' Resp. Mot. Summ. J; Allen Dep. 27:7-9; Pls.' Resp. Mot. Summ. J; Ex. 2, Deposition of Lawrence Williams ("Williams Dep."), 17:19-25, Mar. 5, 2009.)

## III. STANDARD OF REVIEW

### A. MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For there to be a "genuine" issue, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. (Id.)

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, PA, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v.

---

2. Q: So you decided that that was the property you had the order for?
   Det. Bailey: Yeah, I miscalculated. I thought that was the right house.
      Q: Was there any number on the house?
      Det. Bailey: No.
      Q: Did you make any attempt to determine what the number was?
      Det. Bailey: Yea, I did, but I just – I was wrong. I just made a mistake.
(Defs.' Mot. Summ. J., Dailey Dep. 16:13-22.)

Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993.) Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." (Id. at 325.) Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Center, 190 F.3d 231 (3d Cir. 1999).

### B. QUALIFIED IMMUNITY

Qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S.

511, 526 (1985)). "Most public officials are entitled only to qualified immunity" from section 1983 actions. Yarris v. County of Delaware, 465 F.3d 120, 135 (3d. Cir. 2006); see Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (noting that ordinarily, "[q]ualified immunity represents the norm.") (internal quotation marks and citations omitted). Whether to grant qualified immunity is a question for the court, not the jury, and should be decided early in the proceedings so that the defendant may avoid the burdens of litigation. Saucier, 533 U.S. at 200-01. The Court explained that "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made . . . If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Id. at 205.

Saucier articulated a two-step analysis to determine whether a Section 1983 defendant is entitled to qualified immunity. First, the court must determine whether "'[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right[.]'" Hubbard v. Taylor, 538 F.3d 229, 231 (3d Cir. 2008) (quoting Saucier, 533 U.S. at 201).³ If so, the court must then determine "whether the right was clearly established." Id. In considering the second prong of the Saucier test, the Third Circuit clarified that "[a] right is clearly established for the purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hubbard, 538 F.3d at 236 (quoting Williams v. Bitner, 455 F.3d 186, 191 (3d Cir. 2006)). This standard "'gives ample room for mistaken judgments by protecting all but

---

3. Plaintiffs note that the Supreme Court recently held that lower courts are no longer mandated to utilize Saucier's two prongs in order; however, the sequence of analysis does not affect this Court's decision. Pearson v. Callahan, 555 U.S. ----, ----, 129 S. Ct. 808, 818 (2009).

6

the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005)).

### C. SECTION 1983

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. Recovery under § 1983, requires a showing of two elements: (1) defendants acted under color of state law; and (2) their actions deprived the plaintiff of a right secured by the Constitution or federal statutes. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). The Fourteenth Amendment's due process clause shields individuals from the government's arbitrary action. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998).

Plaintiffs, in this case, allege a violation of their substantive due process rights. Substantive due process is the deprivation of a protected interest involving an abuse of official power which "shocks the conscience." United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399 (3d Cir. 2003). Thus, Plaintiff must (1) allege and substantiate a property interest protected by due process, and (2) prove that the government's deprivation of

that property interest shocks the conscience. Cherry Hill Towers, L.L.C. v. Twp of Cherry Hill, 407 F. Supp. 2d 648, 654 (D.N.J. 2006).

## IV. ANALYSIS

### A. CLAIM ARISING UNDER 42 U.S.C. § 1983

Plaintiffs assert that Defendants' actions, per section 1983, violated their constitutional rights under the Fourth and Fifth Amendments as incorporated by the Fourteenth Amendment. (Sec. Am. Compl. ¶ 19.) As all of Plaintiffs' claim arise from the detectives' unlawful search and seizure of their home, this Court will examine their claims under the Fourth Amendment.

Using Saucier's two-step analysis, it is clear that Plaintiffs' had a constitutional right to be free from an unlawful search and seizure.[4] Such a right is clearly established. "The Fourth Amendment . . . provides in pertinent part that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992) (citing Ker v. California, 374 U.S. 23, 30 (1963)). Seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Id. (citing United States v. Jacobsen,

---

4. Plaintiffs also assert, without any explanation, a Fifth Amendment claim. This Court assumes that this claim is a takings claims under the Fifth Amendment's takings clause. This clause "proscribes the taking of private property for public use, without just compensation." U.S. CONST. AMEND. V. Such claims seek to prevent the imposition of private costs for public benefits. But when property has been seized pursuant to the criminal laws such deprivations are not "takings" justifying compensation. Bennis v. Michigan, 516 U.S. 442, 452-53 (1996). Further, a takings claim may only be based on the government's rightful exercise of its property, contract or regulatory powers. Golder v. United States, 15 Cl. Ct. 513, 518 (1988); see also Acadia Technology, Inc. v. United States, 65 Fed. Cl. 425, 430 (Fed. Cl. 2005) (stating that "[t]his was not a Fifth Amendment taking because the goods were not taken for public use but to prevent public harm. The Government acted pursuant to its police power.") Given this, the Court will not address Plaintiffs' Fifth Amendment claim.

8

466 U.S. 109, 113 (1984)). Further, the Supreme Court has been clear that "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." Id. (citing Silverman v. United States, 365 U.S. 505, 511 (1961)).

The Courts have been clear: qualified immunity is appropriate for reasonable actions undertaken by police officer. See Saucier 121 U.S. at 205 (citing Graham v. Connor, 490 U.S. 386, 388 (1989)) ("Because 'police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.") A police officer's actions, even if erroneous, should be subject to qualified immunity if the actions were reasonable. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

The Supreme Court in Maryland v. Garrison, 480 U.S. 79 (1987), examined the parameters of what constituted reasonable behavior under the Fourth Amendment. In Maryland, the police, armed with a valid search warrant, lawfully conducted a search of a third floor apartment. Unbeknownst to the police, the third floor contained not one but two apartments. Id. at 86. Before discovering that the third floor contained two apartments – one occupied by McWebb that was subject to search, and the other occupied by plaintiff Garrison – the officers searched the former and found and seized illegal contraband. Id. at 81. Subsequently, upon discovering that there was a second apartment, the officers halted their search. Id. at 82. The

Court held that the officers' actions did not violate Garrison's Fourth Amendment rights. Id. at 86. The officers had a valid warrant to search the apartment occupied by McWebb, McWebb granted the police entrance to the apartment, and the police discontinued the search once they recognized that there was a separate, third floor apartment not encompassed by the search warrant. Id. at 86-87. Finding that the officers did not violate Garrison's Fourth Amendment rights, the Court noted that "[w]hile the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." Id. at 87. Further, the Court noted that "the officers' conduct was consistent with the reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." Id. at 88.

In Fullard v. City of Phila., Civ. A. No. 95-4949, 1996 U.S. Dist. LEXIS 5321 (E.D. Pa., Apr. 22, 1996), the court examined whether police officers violated the Fourth Amendment rights of the occupants of a home when they entered the home based on inaccurate information contained on the arrest warrant. Police were attempting to arrest an individual alleged to have robbed a bar at gunpoint, and their records erroneously indicated that the robber lived at 754 North Uber Street. Id. at *4 Only after a police SWAT team raided 754 North Uber Street was it discovered that the police department's records were mistaken as the robber lived at 752 North Uber Street, and that an innocent family lived at 754 North Uber Street. Id. That family subsequently filed suit alleging that this erroneous search violated their Fourth Amendment rights. Id. The court disagreed noting that the officers who executed the warrant deserved qualified immunity as "these officers, possessing a valid arrest warrant and acting in

10

reliance of an investigation conducted by their supervisors, reasonably believed that they were at the right address, they cannot be said to have violated rights of which a reasonable officer would have known." Id. at *30.

The Fullard court went on to note that the reasonableness determination turned upon a careful examination of objective facts. Specifically, the court stated that "there are many cases in which courts have denied claims of qualified immunity by police personnel being sued under § 1983." Id. at 20-21. But unlike in Fullard, those instance when qualified immunity was not granted involved officers aware of factual discrepancies that "would have placed reasonable officers on notice that they were searching the wrong premises." Id. at 20-21. The court examined a number of cases concluding that "officers who have conducted a wrongful search or seizure are entitled to qualified immunity unless they knew information which would have alerted a reasonable officer of the possibility of a fourth amendment violation." Id. at 27.

The Fullard court found that defendant officers' actions were analogous to those of the officers in Hartsfield v. Lemacks, 50 F.3d 950 (11th Cir. 1995). Id. In Hartsfield, police officers possessed a valid warrant to search 5108 Middlebrooks Drive, but mistakenly searched 5128 Middlebrooks Drive. Id. at 951. The search of 5128 Middlebrooks Drive lasted for ten to fifteen minutes before the officers looked at the search warrant and realized that they were at the wrong house. Id. at 951. The Hartsfield court declined to grant qualified immunity to the deputy who led the police officers on the home raid, noting that there were numerous, factual reasons why the deputy's actions were unreasonable: he had been to the correct home – 5108 Middlebrooks – the day prior; the homes looked different; each of the homes' street numbers were clearly marked; and they were located on different parts of the street. Id. The court noted

11

that the deputy "did not check to make sure that he was leading the other officers to the correct address, let alone perform any precautionary measures such as those performed by the officers in Garrison." Id.

In the present case, it is clear that Officer Dailey's actions were unreasonable. The detective knew that on March 28, 2007, they were to seize two forfeited homes. After securing "2940-42 W. Clementine St.," the officers were to re-stage at "2600 W. Silver St." before sealing "2637 W. Silver St." (Defs.' Mot. Summ. J., Ex. A List of Home Sealings for the Week of March 26, 2007.) Instead, Officer Dailey proceeded down the 2600 block of West Silver Street, and upon noticing a home where one individual was leaving and another was entering he determined that this was the home to be sealed.[5] See (Id.; Dailey Dep. 111:21-12:13.) The home did not have its street number posted, but, based on the activity, Officer Dailey "thought that that was the property. I mistook the property for 2637."

The detectives in this case possessed a valid order to enter a home. But as in Hartsfield, Officer Bailey did not enter the correct home. The home to be sealed was a different home, on the opposite side of the street, with its street number clearly marked. Officer Dailey, noting that the 2636 West Silver Street was unnumbered, did not stop to check if he was on the "even" or "odd" side of the street much less at the right home. Instead, he unreasonably concluded that Plaintiffs' residence was the one to be sealed simply because people were exiting and entering it. People routinely exit and enter homes in the morning.[6] It is unreasonable to witness such activity, and conclude – without any further verification – that this is the home to be

---

5. Whether those exiting and entering were carrying beer, as Officer Dailey states, is of no consequence.

6. Perhaps entering with beer in hand is more uncommon at such a time.

sealed. Yet, Officer Dailey did not stop there. Rather, he acted upon his mistaken belief and began to evict occupants from their home so it could be sealed. As Plaintiffs' counsel aptly notes "[i]f detectives had gone to the 2600 block of West Silver Street and selected a house at random to seal, there would be no question as to the unreasonableness of the detectives' conduct. But their selection of the plaintiffs' house in this case is indistinguishable from such random action." (Pls.' Resp. Mot. Summ. J. 6.)

While the actions of Officer Dailey were unreasonable, this Court concludes that the decision of the other officers to enter 2636 West Silver Street was not unreasonable. Like the officers in Hartsfield, these officers were simply following the lead of one acting as if he was appropriately carrying out a valid legal action. It is not unreasonable for the other detectives to conclude that Officer Dailey had determined that he was entering the appropriate home. Sealing a home is a difficult process. Evicting residents can be a tense process fraught with conflict and potential for danger. That officers would quickly follow a colleague into a home to be sealed is unexceptional. Once efforts to seal a home are underway, it is unsurprising that the officers are focused on the task at hand – sealing of the home – and not looking to see if the home is correctly numbered. The time for determining whether they were entering the appropriate home was before entering it. Under this narrow set of circumstances, qualified immunity is appropriate on the issue of home entry and seizure for the remaining officers, some of whom did not arrive until the time it was determined that they were seizing the wrong home.

But the qualified immunity inquiry does not end there, as the outstanding issue remains as to whether or not the officers bolted Plaintiffs' home, barred re-entry, and then did not

13

unlock the home so that Plaintiffs could return home. The detectives assert that 2636 West Silver Street was never padlocked because:

> [a]s soon as the last person came out and she noticed that we were at the wrong place, everybody can go back in, so McConnell never got a chance to go to his car and get the drill because we were letting everybody back in. We had discovered that we were at the wrong property, so that property was never padlocked.

(Dailey Dep. 22:11-17.) The detective in charge agreed with Officer Dailey, stating that 2636 West Silver Street could not have been locked because:

> [w]hen we do these – Karen maintains – Detective Hayward maintains the eye bolts and the locks again because she's at every property. If for some reason I have some other obligation, she's able to take care of that to secure the property. Another detective will take the drill to drill the holes or whatever, but I have to wait for her to show up to get the eye bolts and the lock. And I recall when this was brought up when she finally showed up, we were already across the street to the other property.

(McConnell Dep. 26:22-27:7.)

To the contrary, Allen asserts that the detectives padlocked his home placing "[t]wo on the front, one on the back." (Pls.' Resp. Mot. Summ. J.; Allen Dep. 32:16.) Mr. Allen witnessed the detectives padlock his house stating that he "saw them. They had drills and stuff in their hands, screws." (Id. at 32:19-20.) Allen stated that the detectives did not remove the padlocks, and he was not able to re-enter his home before 1:30 in the afternoon. (Id. at 33:3-5.) Allen states that he spent a considerable amount of time trying to "get my doors and stuff back in

order," cutting off the padlocks with a hammer and hacksaw. (Id. at 37:8-38:14.) He further claims that the front, back, and cellar door were damaged. (Id. at 38:18-39:20.)

This creates a genuine issue as to material facts. For summary judgment purposes, viewing the evidence in favor of the non-moving party, the alleged improper sealing and failure to re-open Plaintiffs' home amounts to an unlawful violation of their Fourth Amendment rights. Accordingly, summary judgment dismissal of the Fourth Amendment claims against the individual detectives is unwarranted.

**B.    STATE LAW CLAIM**

Plaintiffs also assert a state-law claim stating that Defendants' actions "constitute unlawful seizure and taking of property under the laws and Constitution of the Commonwealth of Pennsylvania." (Sec. Am. Compl. ¶ 22.) Plaintiffs' own Response to Defendants' Motion for Summary Judgment questions the viability of this claim. Specifically, Plaintiffs stated that:

> there is no question that the Defendants' conduct violated the laws and Constitution of the Commonwealth of Pennsylvania and that their actions were grossly negligent. However, the plaintiffs' concede that the defendants' actions do not come within one of the exceptions of the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §8542 and it is doubtful that they rise to the level of willful misconduct required by Section 8550 of the Act.

(Pls.' Resp. Mot. Summ. J. 10.)

Section 8452 protects municipalities from state-law liability, and Section 8545 extends the scope of the Act to protect governmental employees. Bright v. Westmoreland

County, 443 F.3d 276 (3d Cir. 2006) (applying Pennsylvania Political Subdivision Tort Claims Act to law enforcement officials as their conduct was not deemed "willful misconduct.") Section 8550 permits actions against governmental employees who by their misdeeds are determined to have "caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply." 42 Pa. CONS. STAT. § 8550. Plaintiffs notes that it is unlikely that Defendants' actions constitute "willful misconduct." By implication, they acknowledge that Defendants' actions do not constitute a crime, were not fraudulent, and did not involve actual malice.

The Pennsylvania Supreme Court has defined willful misconduct as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Vega v. Columbia Borough, Civ. A. No. 08-05932, 2009 WL 2143549, at *5 (E.D. Pa. July 15, 2009) (citing Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006)). "Otherwise stated, the term willful misconduct is synonymous with the term intentional tort." Id. Under Pennsylvania law, "willful misconduct" for which an employee of local agency is not immune, is misconduct which the perpetrator recognized was misconduct but still carried it out with intention of achieving exactly that wrongful purpose. In re City of Phila. Litig., 938 F. Supp. 1264 (E.D. Pa. 1996).

There is no indication that Defendants' actions were anything other than a mistake. Even if the mistake was unreasonable, there is no evidence suggesting that their actions

16

amounted to willful misconduct. Accordingly, summary dismissal of Plaintiffs' state-law claim is granted.

### C. DISMISSAL OF DISTRICT ATTORNEY'S OFFICE

On June 15, 2009, the parties stipulated that both the City of Philadelphia and former Police Commissioner Sylvester Johnson should be terminated from the suit parties stipulated that the City be dismissed as a Defendant "based on the assertion of the defendants that the District Attorney's Office of Philadelphia, as the employer of the named defendant detectives was the proper party to defend this action." (Pls.' Resp. Mot. Summ. J. 4; Docket No. 21.) In their Motion for Summary Judgment, Defendants currently seek dismissal of the District Attorney's Office, as it is not a proper party as "all suits against any department of the City must be brought in the name of the City itself because the departments of the City do not have an independent corporate existence."

Plaintiffs' counsel objects, however, claiming that it is "disingenuous" to assert that the action cannot now be brought against the District Attorney's Office. (Id.) As a result, Plaintiffs seek permission to bring this suit against the District Attorney's Office or to have the City of Philadelphia reinstated as a party.

The first option is not possible as it is clear that the District Attorney's Office "is not an entity for purposes of § 1983 liability," and it should be dismissed. Reitz v. County of Bucks, 125 F.3d 139, 148 (3d Cir. 1997). As to the second option, the City of Philadelphia as any municipality, may only be held liable under § 1983 when the "execution of a government's policy or custom . . . inflicts the injury." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir.

1990).  While a government policy is established by a "decision maker possessing final authority," a custom arises from a "course of conduct . . . so permanent and well settled as to virtually constitute law."  Andrews, 895 F.2d at 1480 (citing Monell v. Dept. of Soc. Srvs. of the City of N. Y., 436 U.S. 658 (1978)).  Plaintiffs seeking to recover from a municipality must: (1) identify an allegedly unconstitutional policy or custom; (2) demonstrate that the municipality, through its deliberate and culpable conduct, was the "moving force" behind the injury alleged; and (3) demonstrate a direct causal link between the municipal action and the alleged deprivation of federal rights.  Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

Plaintiffs have provided no evidence that any custom, policy, pattern, or practice of the City's District Attorney's Office contributed to any of the injuries alleged by Plaintiffs.  Accordingly, were this Court to reinstate the City of Philadelphia as a Defendant, it would do so only to have to dismiss the City subsequently because Plaintiffs have made no showing of municipal liability that could survive summary dismissal.  Accordingly, the District Attorney's Office of the City of Philadelphia is dismissed.

## V.  CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is granted in part and denied in part.